**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

SHEILAH DAVIS                                                                    PLAINTIFF

V.                                    CASE NO. 5:16-CV-5194

KIMBEL MECHANICAL SYSTEMS, INC.;
ROB KIMBEL; BRAD SMITH; and DUSTIN HUGHES                    DEFENDANTS

<u>**MEMORANDUM OPINION AND ORDER**</u>

Currently before the Court are an Amended Motion for Summary Judgment (Doc. 23), Brief in Support (Doc. 24), and Statement of Undisputed Facts (Doc. 25) submitted by Defendants Kimbel Mechanical Systems ("KMS"), Rob Kimbel, Brad Smith, and Dustin Hughes (collectively "Defendants"). Plaintiff Sheilah Davis ("Davis") has submitted a Response in Opposition (Doc. 29) and a Statement of Facts in Dispute (Doc. 30) to which the Defendants have submitted a Reply (Doc. 33). The briefs referenced above are amended and substituted versions of briefs first submitted in March of 2017. The Amended Motion for Summary Judgment is now ripe for decision, and for the reasons stated herein, is **GRANTED IN PART AND DENIED IN PART**.

## I.  BACKGROUND

### A. Factual Background

Many of the crucial events surrounding this litigation are not in dispute, as the parties generally agree that most in fact occurred. However, the parties paint radically different portraits of the importance of these events to the present case. Because the instant Motion is one for summary judgment, the Court will recite the facts in the light most favorable to Davis, the non-moving party, and will limit its discussion only to what is necessary to provide context for the Court's decision. In addition, because the temporal

ordering of events is crucial for certain of Davis's claims—especially the retaliation claims—the Court will recount events chronologically.

Davis began working for KMS as a receptionist on August 29, 2011. Sometime in or about April of 2014, Davis was promoted and put in charge of the newly established Warranty Department.[1] As Defendants note, "for all practical purposes, she *was* the Warranty Department as initially constituted." (Doc. 19, p. 1). During the early part of her time managing the Warranty Department, Davis was paid at a rate of $22.00 per hour. Due to the amount of overtime she accrued, Davis earned around $90,000 in 2014— approximately twice the amount she would have made working a 40-hour work week.

As a result of the company's substantial growth, in or around January 2015, KMS began a company-wide restructuring. KMS initially restructured both the accounting and pre-con departments as part of this process. At around that same time, KMS assigned Sean DeWitt,[2] a Project Manager who handled special projects for the company, to work inside the department.[3] In part due to the tremendous number of overtime hours she had

---

[1] There appears to be quite a bit of semantic bickering between the parties on this issue. While Defendants admit that Davis was initially managing the Warranty Department, they dispute that she was ever a "Director." For their part, Defendants submit that according to the KMS organizational chart and emails in the record, Director-level positions are O5-Level Positions that report directly to the President or CEO of KMS. Davis was never at any point an O5, a point she readily admitted during her deposition. *See* Doc. 30-1, p. 27; Doc. 30-13, p. 1. However, Davis asserts that she was the Director of Warranty and submits evidence, including a KMS business card and an employment evaluation that do list her as "Warranty Director." *See* Doc. 30-11, p. 1; Doc. 30-10, p. 1. Additionally, her counsel argues in the Reply brief (Doc. 29) that, for all intents and purposes, Davis functioned as an O5. The Court takes this point up below when discussing her ADEA, Title VII, and Equal Pay Act claims.

[2] Sean Dewitt is mistakenly referred to as Shawn Hughes in Davis's Complaint.

[3] Because of DeWitt's prior roles in helping with special KMS projects and his background in Business Accounting, KMS tasked him with working in the Warranty Department temporarily to assess the Department's systems and help streamline their processes so

been required to work, Davis requested that KMS provide her department with help, acknowledging that KMS's growth meant that to accomplish the Warranty Department's work, the job now required the addition of at least several people.[4] In fact, she "begged" that the Warranty Department be the next department to be restructured. *See* Doc. 33-1, p. 8.

Sometime in or around February 2015, Davis was diagnosed with diabetes ketoacidosis, diabetes mellitus, fibromyalgia, Bell's palsy, depression, and thyroid disorders. Although Davis was hospitalized around this time, her health problems initially did not prohibit her from working. On a couple of occasions, she requested to work a day or two at home, which her supervisor, Dustin Hughes, approved.

Although neither could remember the exact timeframe, both Davis and another employee of the Warranty Department, Madison Spears, stated that sometime before KMS officially announced that it was restructuring the Warranty Department to the rest of the company, an intra-department meeting was held where these changes were announced. In preparation for the meeting, Dustin Hughes, KMS's Chief Operations Officer (COO) and Davis's direct supervisor, had drawn circles on a white board, with him occupying the highest circle, Sean DeWitt occupying the circle under Hughes, and Davis and Spears occupying circles below DeWitt. At that meeting, Davis asked Hughes if he needed to put her name up there as the director still, and Hughes reportedly told her that "I guess you're not the manager, you're demoted" and that she was "no longer in the title

---

that they could "establish a structure and process that were scalable and repeatable as the company grew." *See* 30(b)(6) Deposition of Travis Keller, Doc. 30-8, p. 5.

[4] *See* Doc. 25-2, p. 30 (Davis's deposition, at which time she said that four people were required to do the job effectively).

role." (Doc. 30-1, pp. 19, 21).

On or about April 9, 2015, KMS officially announced the restructuring of the Warranty Department to the rest of its employees via a company-wide email.[5] *See* Doc. 25-3, p. 3. The restructuring divided the Warranty Department into four regions, with one person in charge of each region. As part of its restructuring, KMS requested that employees needing assistance from the Warranty Department on particular projects should work with the coordinator who was assigned to oversee that region. *Id.* Davis was placed in charge of the Northwest Arkansas Market Housing region, which she recognized as the most important role, due to the nature and responsibility associated with the region and the fact that it was essentially KMS's "home base." (Doc. 25-2, pp. 130-31). DeWitt was also placed over one of the four regions. The other two regions were assigned to two females: Madison Spears and Brandy McGough.

Davis testified that after the email was sent to all KMS employees, she was called in for yet another meeting with Hughes. Davis alleges that at this second meeting, Hughes stated that Davis was being demoted to manager of the Northwest Arkansas Housing Market due to health reasons. (Doc. 30-1, pp. 20-21). Davis alleges that Hughes repeated this statement the next day in the presence of DeWitt. At this second meeting, Davis "kept repeating different questions to [Hughes], you know, you really can't tell me why you demoted me? And he said, it's your health, your health." (Doc. 30-1, p. 23).

_____

[5] Davis acknowledges several times during her deposition that the restructure (dividing the Warranty Department into regions with individuals taking over particular regions) did occur around this time. *See* Doc. 25-2, pp. 31-32. In fact, during her deposition, she stated that she still received calls from people with questions and would have to refer them to the correct manager for that particular region. *Id.* at 35. In her Reply Brief, however, Davis submitted an affidavit from her daughter, a former KMS employee, who stated that the Warranty Department was not restructured (Doc. 30-3, p.1). This will become especially relevant when the Court considers the issue of pretext below.

On May 26, 2015, Davis presented a doctor's note requesting that she be allowed to work from home for six months due to her medical conditions. After she presented the doctor's note, Davis met twice with Hughes to discuss whether an accommodation could be made. Davis alleges that the first meeting lasted only five minutes. (Doc. 30, ¶ 45). She further alleges that DeWitt was present for the second meeting, but then alleges that this meeting was actually an email. *Id.* The email, sent by Hughes on June 19, sets forth the terms of Davis's accommodation, which she agreed to in writing on June 21, 2015. (Doc. 25-3, p. 5). That email also confirmed Davis's position with the company, including that she had been officially changed from an hourly position to a salary (earning $71,500 per year).[6] According to the terms of the accommodation, Davis was to work from home three days a week for six months with the intention of returning full-time at the end of the six-month period or sooner, if possible. *Id.* Davis alleges that KMS eventually had her working four days a week before the six-month period ended due in part to the fact that DeWitt had a standing engagement on Thursdays and she was needed at the office to cover.

On July 6, 2015, Davis informed KMS that she needed to take time off effective immediately and requested to use her accrued vacation time. Although KMS's policy usually required two weeks advanced notice before using vacation time, KMS approved the request. Around this same time, DeWitt was tasked with managing the Warranty

---

[6] Though both parties agree that Davis was changed to a salary while still an active KMS employee, there is conflicting evidence about *when* that change took effect. *Compare* Doc. 25-3, p. 5 (Email from Hughes stating new salary became effective on June 1, 2015) with Doc. 30-12 (KMS Transfer form showing new title and salary effective date of June 8, 2015). Regardless of when the change occurred, it is undisputed that the salary was computed by estimating the hours her position would require after the restructure multiplied by her last wage rate of $22 per hour.

Department. As Defendants note, because Davis was away from the job due to her disability, DeWitt had to stay longer in the Warranty Department and fill Davis's role until new people could be hired and trained. (Doc. 30-8, p. 8). On or about August 10, 2015, Davis's husband asked KMS if Davis could use un-accrued vacation time to cover additional time off.  KMS granted this request.

On September 9, 2015, Davis's physician assessed that she would be able to work "0 hours per day." (Doc. 25-2, p. 21-22).  Although she had to call KMS to inquire about the process, on or about September 25, 2015, Davis requested leave under the FMLA, which KMS granted and made retroactive to the first day of her leave period—July 7, 2015.  Davis has stated that her condition has steadily worsened so that, since September of 2015, she now spends around 80-90% of each day in bed. (Doc. 25-2, p.16). Although she has not returned to work since July of 2015, Davis is still an employee for KMS. While she is considered an "inactive" employee, KMS currently pays portions of Davis's health insurance, Short and Long-Term Disability Insurance Coverage, and all of her life insurance premium.  (Doc. 24, p. 6; Doc. 29, p. 2).

## B. Procedural Background

Although she never filed a formal complaint or report of discrimination with KMS, Davis filed a charge of discrimination with the EEOC on or about September 24, 2015. Davis subsequently filed the present Complaint in the Circuit Court of Washington County, Arkansas, on June 14, 2016, against KMS and Individual Defendants Rob Kimbel (Owner, KMS), Brad Smith (CEO of KMS), and Dustin Hughes (again, her direct supervisor and KMS COO).  Her Complaint asserts as a basis for the lawsuit that her reduction in pay from $90,000 to $71,500 and her demotion from overseeing the entire Warranty

Department to being just a Manager (along with the reduction in responsibilities that this entailed) were made for discriminatory reasons. In addition, Davis asserts that KMS retaliated against her for engaging in statutorily protected activities, including asking to work at home because of her disability, filing for FMLA benefits, and filing an E.E.O.C. complaint. As such, the Complaint alleges eight causes of action[7]: 1) disability discrimination under the Americans with Disabilities Act ("ADA"), 2) retaliation for requesting reasonable accommodation under the ADA, 3) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 4) gender discrimination in violation of Title VII of the Civil Rights Act, 5) interference with rights protected by the Family and Medical Leave Act ("FMLA"), 6) retaliation for asserting her FMLA rights, 7) violations of the Equal Pay Act ("EPA"), 8) and violations of the Arkansas Civil Rights Act ("ACRA"). (Doc. 3). The Defendants promptly removed the action to this Court (Doc. 1).

On August 26, 2016, the individual Defendants (Kimbel, Smith, and Hughes) filed a Motion to Dismiss (Doc. 10) and Supporting Brief (Doc. 11) on the grounds that Davis's Title VII, ADA, ADEA, and non-retaliation ACRA claims are not cognizable against these individuals in their individual capacities. On September 16, 2016, the Court granted the Motion, dismissing Davis's Title VII, ADA, ADEA, and non-retaliation ACRA claims against these individual Defendants with prejudice. (Doc. 14).

Following that Order, the Defendants filed a Motion for Summary Judgment on March 14, 2017 (Doc. 18) to which Davis filed a Response (Doc. 21) on March 27, 2017. Davis's Response indicated that because the parties were still in the midst of discovery,

---

[7] Although the Complaint is sometimes vague about the causes of action being asserted, the filings submitted by the parties throughout this case have clarified the true causes of action, which appear to be those listed here.

summary judgment would be improper. The Defendants' Reply Brief (Doc. 22), filed on March 29, 2017, stated that because the discovery deadline was only a couple of months away, Defendants were agreeable to postponing a decision until after that time so that they could file an Amended Motion for Summary Judgment. A week after the discovery deadline passed, Defendants filed an Amended and Substituted Motion for Summary Judgment (Doc. 23), Brief in Support (Doc. 24), and Statement of Facts (Doc. 25). Davis submitted a timely Response (Doc. 29), to which the Defendants submitted a Reply (Doc. 33). This Amended Motion for Summary Judgment is ripe for decision.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT[8]

The standard for summary judgment is well established. Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l. Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).

Once the moving party has met its burden, the non-moving party must "come

---

[8] Davis has alleged violations constituting eight separate causes of action. To improve readability, the elements required to establish the *prima facie* case for each of these causes of action and the burden-shifting framework used to analyze some of her causes of action will not be recited here in one large legal argument section. Rather, the Court will discuss these below when analyzing whether the claims survive summary judgment.

forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)).  However, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to survive summary judgment. *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Rather, in order for there to be a genuine issue of material fact that would preclude summary judgment, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  To meet its burden, "[t]he nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

### III. DISCUSSION

Davis has asserted eight different causes of action against the Defendants.[9] These

---

[9] As previously noted, the individual Defendants (Kimbel, Smith, and Hughes) had originally been sued in their individual capacities for each of these causes of action. However, by this Court's order in September of 2016, all of Davis's claims against them under Title VII, the ADA, the ADEA, and the ACRA have been dismissed with prejudice except Davis's retaliation claim under the ACRA, which does permit retaliation suits against supervisors in their individual capacities. It appears, therefore, that the only claims against these individuals that remain are the ACRA retaliation and EPA claims. Although the Eighth Circuit has not definitely ruled that EPA claims are cognizable against supervisors in their individual capacities, the statutory definition offered in the EPA suggests that they are. *See* 29 U.S.C. § 203(d) (defining an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee and include[ing] a public agency…."). The Court would note that this definition differs significantly from the definition of employers in the ADA and ADEA and therefore compels a different conclusion about the amenability of these supervisors to be sued in their

range from claims of age and gender discrimination to violations of the ADA and the ACRA. Because of the sheer number of claims against the Defendants and for organizational clarity, the Court will divide this section into two sub-sections: one focusing on the claims that are subject to the familiar *McDonnell Douglas* burden-shifting framework and one focusing on the remaining, analytically distinct claims that are analyzed according to different standards. Within each sub-section, the Court will consider each claim in turn to determine whether it should survive the Defendants' Motion for Summary Judgment.

## A. The *McDonnell Douglas* Claims

While the elements required to establish *prima facie* cases for each of the causes of action Davis asserts are different (and therefore discussed below when evaluating each cause of action), certain of her causes of action are analyzed using a now familiar burden-shifting framework. Indeed, Davis's ADA disparate treatment and retaliation, gender and age discrimination, and FMLA retaliation claims are analyzed through nearly identical processes.[10] The Court would note here that because her ADA reasonable accommodation claim, FMLA interference claim, and EPA claim are not governed by this identical framework, the process for setting forth those claims is discussed in the next

---

individual capacities.

[10] *See, e.g.*, *Olsen v. Capital Region Med. Ctr.*, 713 F.3d 1149, 1153 (8th Cir. 2013) (applying the *McDonnell Douglas* framework to ADA discrimination claims); *E.E.O.C. v. Prod. Fabricators*, 763 F.3d 963, 972 (8th Cir. 2014) (applying *McDonnell Douglas* to ADA retaliation claims); *Tusing v. Des Moines Indep. Comm. Sch. Dist.*, 639 F.3d 507, 515 (8th Cir. 2011) (applying *McDonnell Douglas* to age discrimination claims); *Robinson v. Am. Red Cross*, 753 F.3d 749, 754 (8th Cir. 2014) (applying *McDonnell Douglas* to Title VII retaliation claims); *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 878 (8th Cir. 2014) (applying *McDonnell Douglas* to gender discrimination claims); *Sisk v. Picture People, Inc.*, 669 F.3d 896, 899 (8th Cir. 2012) (applying *McDonnell Douglas* to FMLA retaliation claims).

sub-section when the Court considers the non-*McDonnell Douglas* claims.

A plaintiff may establish a discrimination or retaliation claim through either direct or indirect evidence. *See King v. United States*, 553 F.3d 1156, 1160 (8th Cir. 2009). In the absence of direct evidence, "the court analyzes [a plaintiff's] claim under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Tusing* 639 F.3d at 515 (citing *King v. United States*, 553 F.3d at 1160). Under that framework, a plaintiff bears the initial burden of establishing a *prima facie* case. *Id* (citing *King*, 553 F.3d at 1162). Once the plaintiff does so, "the burden of production then shifts to the employer to articulate a legitimate non-discriminatory reason for its employment action." *Id.* (citing *King*, 553 F.3d at 1160). If the Defendant can meet that burden of production, then the burden shifts back to the plaintiff "to demonstrate by a preponderance of the evidence that the stated non-discriminatory rationale was a mere pretext for discrimination." *Id.* (quotation and citation omitted).

Therefore, for Davis's ADA discrimination and retaliation, age and gender discrimination, and FMLA retaliation claims, the Court will first evaluate whether Davis has presented direct evidence showing discrimination. If so, then the claim is entitled to go to the jury. If not, the Court will follow the burden-shifting framework outlined above to determine whether summary judgment is proper.

The Court would also note that the *McDonnell Douglas* framework is not all that these claims have in common. In addition, each requires the plaintiff to prove, as part of establishing a *prima facie* case, that she has suffered an adverse employment action. As such, before turning to the individual claims, the Court feels compelled to address an argument made by Defendants in both their Amended Motion for Summary Judgment

and their Reply Brief that Davis has not shown that she suffered an adverse employment action. *See* Doc. 24, pp. 9-12; Doc. 33, pp. 1-2. To them, this failure means that she cannot establish a *prima facie* case for any discrimination cause of action or for her FMLA retaliation claim and, therefore, that summary judgment is proper on all of these claims.

In essence, Defendants' argument is that none of the three employment actions that Davis has alleged qualifies as an adverse employment action because they were all after-effects of the company-wide restructuring that KMS began in the early part of 2015 and/or because they were in fact favorable to her. Davis has alleged that these three actions were: 1) changing her from an hourly employee to a salary of $71,500, 2) effectively demoting her from her former position as the director of the Warranty Department to a manager of one region of the restructured department, and 3) the concomitant reduction in responsibilities as part of her new job.

Courts define an "adverse employment action" to be one that involves a "tangible change in working conditions that produces a material employment disadvantage." *Spears v. Mo. Dep't of Corr. & Human Res.*, 210 F.3d 850, 853 (8th Cir. 2000). The Eighth Circuit has held that a number of events qualify as adverse employment actions, including termination, reductions in benefits or pay, changes in title, or changes in employment that significantly affect an employer's future career prospects. *Id.* However, "minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not [qualify]." *Id.* (citing to *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997)). This is so because employers have wide latitude to make business decisions and because "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions." *Torlowei v. Target*, 401 F.3d 933, 935 (8th

Cir. 2005) (quoting *Wilking v. Cnty. of Ramsey*, 153 F.3d 869, 873 (8th Cir. 1998)) (quotation omitted). In fact, "an employer has the right to assign work . . . to change an employee's duties, to refuse to assign a particular job . . . and to discharge an employee for good reason, bad reason, or no reason at all absent intentional . . . discrimination." *Walker v. AT&T Tech.*, 995 F.2d 846, 849-50 (8th Cir. 1993).

The Court agrees with the Defendants that Davis cannot establish that her change from an hourly employee to a salaried employee was an adverse employment action. As an initial matter, the Court would note that the undisputed evidence in the record establishes that the only reason that Davis made $90,000 the year prior to the change to a salary was because she was working inordinate amounts of overtime. (Doc. 30-1, p. 25). This $90,000 figure was not some base, guaranteed pay amount that Davis was entitled to each year. In fact, as the Court noted in the background section above, in order to earn $90,000 at a salary of $22 per hour, Davis was likely working almost double what her regular hours would have been. Davis herself admitted during her deposition that her high pay was due to this amount of overtime. *See, e.g.*, Doc. 30-1, p. 4 ("I'm working 70, 80 hours for the company . . . ."). Perhaps more importantly, Davis put forward no evidence to counter the Defendant's evidence that she was actually *helped* by conversion to salary because it enabled her to benefit from more favorable leave time/pay and because she made more after the conversion to salary than she had in the preceding months when still an hourly employee. *See* Doc. 24, p. 12; Doc. 25-1, ¶ 7. In fact, Davis's counsel acknowledged in the Reply Brief that, "on paper, this was a raise." (Doc. 29, p. 16). The evidence thus confirms that the change was in fact beneficial to her, as this is not a situation where both pre-and-post change to salary, Davis was doing the same

*amount* of work and being *paid less for* it. Therefore, Davis has not demonstrated that this change was materially adverse to her and it cannot constitute an adverse employment action.

As for the alleged demotion from Warranty Director to Northwest Arkansas Regional Manager and the concomitant reduction in responsibilities, it is clear that Defendants dispute that Davis ever held the official title of Warranty Director and/or that she ever suffered a demotion.[11]  Defendants also argue that Davis requested help because of the excessive number of hours she was working and that the company, as part of its restructuring process, ended up agreeing to restructure her department.  They contend that, at bottom, this case centers on the fact that Davis simply did not like the form that the assistance she received took. While Defendants do adduce evidence in the record to support their contention that the actions it took were related to the company-wide restructure, this Court is not persuaded that it can simply hold as a matter of law at this point that these two actions do not constitute adverse employment actions and thereby dispose of most of Davis's claims in one fell swoop.

To the contrary, where there is some dispute as to facts which would be central to establishing an element of Davis's *prima facie* case (here, whether she suffered an adverse employment action in the form of a demotion during the restructure), the Court finds that these two actions and Davis's supporting evidence satisfies the minimal showing necessary at the *prima facie* stage to meet the requirement of demonstrating that she suffered an adverse employment action. In short, at the summary judgment stage, where there is a genuine dispute about material facts necessary to establish an

---

[11] *See* the discussion *supra* at p. 2, n.1 about the evidence that both sides put forth on this issue.

element of the *prima facie* case, ties go to the plaintiff. Davis has alleged injurious effects caused by Defendants' actions in restructuring the Warranty Department, and this is enough at the *prima facie* stage to demonstrate that she suffered an adverse employment action. *Johnson v. Ark. State Police,* 10 F.3d 547, 551 (8th Cir. 1993) (noting that the threshold of proof necessary to make a *prima facie* case is "minimal").

The evidence that Defendants produce about the restructure should not have the dispositive effect that Defendants urge in their briefing, but rather is more appropriately considered once the plaintiff meets the *rest* of her *prima facie* case and the burden of production shifts to the employer to advance a legitimate, non-discriminatory reason for taking those two actions. Thus, to the extent that Davis has to demonstrate that she suffered an adverse employment action as an element of her *prima facie* case for the claims discussed below, she has done so.

As such, because all of her discrimination and retaliation claims are analyzed under the burden-shifting framework of *McDonnell Douglas*, the Court will first analyze below whether Davis has met the remaining elements of her *prima facie* case. If she does not, then summary judgment is proper for the Defendants. If she can make out the rest of the *prima facie* case for each of the claims that require proof of an adverse employment action, the Court must consider whether the Defendants have produced sufficient evidence of legitimate, non-discriminatory reasons for the actions it took. If that occurs, Davis must then provide sufficient evidence indicating that these asserted reasons were merely a pretext for unlawful discrimination.

### 1. ADA Discrimination (Disparate Treatment) Claim

The ADA makes it unlawful for a covered employer to discriminate against any

"qualified individual on the basis of disability." 42 U.S.C. § 12112(a); *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013). Discrimination under the ADA includes, in relevant part, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5). And, the ADA prevents employers from retaliating against persons who invoke the Act's protections. 42 U.S.C. § 12203(a). A plaintiff thus can bring claims under the ADA for failure to accommodate, retaliation, and other forms of disparate treatment. Although the parties have often talked past each other in their filings in this case, it is clear to the Court from the briefings that Davis alleges three distinct disability discrimination claims: a disparate treatment claim (alleging that she suffered an adverse employment action because of her disability), a retaliation claim, and a reasonable accommodation claim. The Court considers the first two claims in this section, and it will consider the analytically distinct accommodation claim in a later section because it does not apply the traditional *McDonnell Douglas* burden-shifting framework.

Before evaluating the evidence in the record, the Court must first determine that Davis was entitled to ADA protection. As the Eighth Circuit held in *Peyton v. Fred's Stores of Arkansas, Inc.*, because of the statutory language, "ADA protection extends *only* to a qualified individual with a disability." 561 F.3d 900, 902 (8th Cir. 2009) (emphasis added). The ADA defines a qualified individual as one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

For the purposes of the present Motion, the Defendants have agreed that Davis is disabled within the meaning of the ADA. But, Defendants argue that Davis was not

"otherwise qualified" within the meaning of the statute. They submit that because Davis requested to work from home five days a week on May 26, 2015, because she was subsequently granted an accommodation to work from home for 3 days a week in June, and because she had to take indefinite leave on July 5, that she was unable to meet the essential functions of her job.

This is unpersuasive to the Court. There, of course, is evidence in the record establishing that Davis has been unable to perform the essential functions of her job since July 2015, when she initially took extended leave, and since that point given her statement during her deposition that she now spends approximately 80-90% of her day in bed. (Doc. 25-2, p. 16). But, these two kernels of evidence do nothing to clarify Davis's ability to perform the essential functions of her job in April 2015 when the restructuring about which she complains was announced. That restructuring, which featured the alleged demotion that forms the bulk of her claim of an adverse employment action, is the central period of time at which her ability, or lack thereof, to perform the essential functions of her job would have to be assessed. Defendants have pointed to no evidence suggesting that she was unable to perform her job at that point in time and the Court has not found any evidence to this effect in the record.

To the contrary, the evidence the Court *does* have suggests that she was satisfying her duties managing the Warranty Department, especially when construing the evidence in the light most favorable to her. For example, the evidence shows that she was working so much overtime in the year immediately before the restructuring that she earned some $90,000, even though she was only paid $22 an hour. Moreover, Defendants' own evidence shows that in the "six pay periods preceding her conversion to salary, Ms. Davis

earned gross hourly wages of: $1,251.25, $1,317,25, $1,399.75, $1,333.75, $1,262.23; and $1,350.25." (Doc. 25-1, p. 2). The Court can infer from the information provided by KMS in that same document that employees at KMS were paid weekly, as it notes that Davis earned a gross wage of $1,375.00 per pay period on salary. At a yearly salary of $71,500, a gross wage of $1,375.00 would mean weekly pay periods (52 installments of $1,375.00).

Therefore, it appears to the Court that in the six weeks prior to Davis's conversion to salary—which, coincidentally would stretch back to April 27, 2015 (only about two weeks after the restructure was announced), she was working a considerable number of hours for KMS.[12] As such, the Court finds that Davis has demonstrated, based upon evidence in the record, that she was a qualified individual within the meaning of the ADA at the time she suffered the adverse employment action.

Because Davis was an "otherwise qualified" individual under the ADA, the Court must move next to determining whether there is direct evidence of disability discrimination. If no direct evidence exists, then the Court will apply the *McDonnell Douglas* framework by determining whether Davis has established the remaining elements of her *prima facie* case.

---

[12] For example, if these six pay figures represented only hourly work (as opposed to hourly work *plus* certain hours of overtime, presumably paid at time-and-a-half), the hourly equivalents (i.e. how much Davis worked) would have been: 57 hours, 60 hours, 64 hours, 61 hours, 57 hours, and 61 hours. Even if some of these pay figures were elevated by overtime pay rates, the Court finds that the evidence is more than enough for Davis to meet her initial burden of demonstrating that, at the time she suffered the alleged adverse employment action, she was working a considerable number of hours for KMS and, therefore, appears to have been "otherwise qualified." While the subsequent total disability in September when she was certified to be able to work "0" hours a week would likely limit her damages under this claim, this subsequent total disability cannot, as a matter of law, foreclose Davis's ability to assert an ADA disparate treatment claim now.

Fortunately, the courts have provided some clarity as to what constitutes direct evidence of discrimination. As the Eighth Circuit noted in *Shaffer v. Potter*, direct evidence includes "evidence of conduct or statements by persons involved in the [decision-making] process that may be viewed as directly reflecting the alleged discriminatory attitude, where it is sufficient to support an inference that discriminatory attitude more likely than not was a motivating factor." 499 F.3d 900, 904 (8th Cir. 2007) (quotation omitted). In simpler terms, direct evidence "most often comprises remarks by decisionmakers that reflect, without inference, a discriminatory bias." *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861 (8th Cir. 2009).

Davis alleges that there is direct evidence here in the form of her deposition testimony that her immediate supervisor, Dustin Hughes, who coincidentally was also the Chief Operations Officer of KMS, told her on two separate occasions (in front of other employees) that she was being demoted and that the only explanation he would give as to the reasons for the demotion was that it was because of her health. (Doc. 30-1, p. 23). The Court agrees with Davis and finds that these statements fall squarely within the Eighth Circuit's definition of direct evidence. They were statements made to Davis by a supervisor (and high-ranking executive for the company) that establish a causal motive between her disability and a resulting adverse employment action. This evidence is also corroborated by other evidence supporting Davis's deposition testimony, including the testimony of Madison Spears (Doc. 30-4, p. 4) and the alleged diagram of the Warranty Department that was drawn on a whiteboard during Hughes's meeting with Davis and the rest of the Warranty Department (Doc. 30-1, pp. 20-22; Doc. 30-4, p. 4).

The Defendants argue that they are entitled to summary judgment on this claim for

two reasons: 1) because there is substantial evidence in the record indicating that KMS had legitimate, non-discriminatory reasons for making the decision it did to restructure (which resulted in the alleged demotion to Northwest Arkansas Regional Manager) and 2) because ADA disparate treatment claims require proof of "but for" causation.

Defendants' first argument misses the mark entirely. Direct evidence means that the Court need not even consider the *McDonnell Douglas* framework. Moreover, the fact that Defendants state in their Reply that they dispute whether these statements were ever made does not help them. To the contrary, it largely supports the Court's decision that there is a clear dispute not just about *a* material fact, but about *the* material fact central to Davis's ADA disparate treatment claim. If these statements were made to Davis, they create the requisite causal link between KMS's knowledge of Davis's numerous health problems (the disability) and an adverse employment action (a restructuring that she claims resulted in a reduction of responsibilities and a demotion to a regional manager position).

Defendants' second argument is a closer question. The Defendants point the Court to the Eighth Circuit's decision in *Pulczinski v. Trinity Structural Towers, Inc.*, for the proposition that ADA discrimination cases require but-for causation. 691 F.3d 996 (8th Cir. 2012). In *Pulczinski*, the panel did indeed say that "[w]e have our doubts about the vitality of the pre-*Gross*" motivating factor precedent. 691 F.3d at 1002; *see also* 8th CIR. CIVIL JURY INSTR. § 9.40 (2013) (requiring that a jury find, *inter alia*, that "the plaintiff's . . . impairment [was a motivating factor] in the defendant's decision. . . . ). These doubts were triggered by the Supreme Court's decision in *Gross v. FBL Financial Services* that "because of" in the ADEA meant "but for." 557 U.S. 167, 176 (2009). In other words, a

plaintiff in an ADEA case must show that age was the but-for cause of the adverse employment action. In the wake of *Gross*, other circuits have interpreted seemingly-synonymous "on the basis of" language in the ADA to require the same "but for" proof. *See, e.g.*, *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010); *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc). Moreover, after *Pulczinski*, another Eighth Circuit panel acknowledged that "*Gross's* reasoning, which it applied to the "because of" language in the Age Discrimination in Employment Act, arguably could be extended to the comparable "on the basis of" language in the ADA." *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 757 n.6 (8th Cir. 2016).

Although the Court recognizes that the Eighth Circuit has expressed its doubts about the continued vitality of the motivating factor standard in ADA disparate treatment cases, it need not decide at this point[13] which standard to apply since the Court finds that, even under the but-for standard, there is sufficient direct evidence (i.e. her deposition testimony that her supervisor twice told her that she was being demoted and that the demotion was due to her health) such that a reasonable jury could find that KMS took these actions *because of* her disability. Because there are genuine disputes about pivotal material facts related to her ADA disparate treatment claim, this Court cannot say as a matter of law that no reasonable jury could find that KMS discriminated against Davis on the basis of her disability. It must therefore deny summary judgment on this claim.

That said, there remains an issue as to the scope of damages that Davis may seek to recover at trial. At some point after April 2015, but not later than September 9, 2015, (the date on which her doctor certified that she could work zero hours a day), Davis

---

[13] Of course, the issue must be decided prior to submitting the case to the jury, and the Court will require the parties to further brief this issue in their proposed jury instructions.

became totally disabled, and therefore ceased to be otherwise qualified under the ADA. This uncertainty as to the onset of Davis's total disability necessitates a further inquiry and ruling as to both the *kind of damages* Davis is entitled to recover and *the length* of time over which those damages may be assessed. Because the parties have (understandably) not briefed these questions, the Court will direct them to submit further briefing on this matter according to the schedule described at the end of this Opinion.

## 2. ADA Retaliation Claim

For retaliation, just as above, the Court first looks for direct evidence of discriminatory conduct. In the context of ADA retaliation claims, "direct evidence of retaliation is evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse-action was in retaliation for the protected conduct." *Lors v. Dean*, 746 F.3d 857, 865 (8th Cir. 2014) (citing *Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011)). Davis puts forward no argument that there is direct evidence in the record establishing retaliation for engaging in protected conduct. As such, the Court must consider this claim in light of the burden-shifting *McDonnell Douglas* framework, which first requires Davis to establish a *prima facie* case.

To establish a *prima facie* case of retaliation, a plaintiff must show that "(1) she engaged in a statutorily protected activity, (2) the employer took an adverse action against her, and (3) there was a causal connection between the adverse action and the protected activity." *Hill v. Walker*, 737 F.3d 1209, 1218 (8th Cir. 2013). "Once the plaintiff establishes this prima facie case, then a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the

adverse employment action." *E.E.O.C. v. Prod. Fabricators*, 763 F.3d 963, 969 (8th Cir. 2014). "If such reason is provided, the burden shifts back to the plaintiff to show that the employer's proffered reason is merely a pretext for intentional discrimination." *Id.* Additionally, "a retaliation claim under the ADA requires a but-for causal connection between the employee's assertion of her ADA rights and an adverse action by the employer." *Oehmke*, 844 F.3d at 758 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517).

Given the evidence in the record, no reasonable jury could find that Davis was retaliated against for seeking an accommodation under the ADA. Davis abandons the argument for this claim that the restructure itself was an adverse employment action caused by Davis's engagement in protected conduct. And right that abandonment is, for there is no evidence in the record that Davis ever engaged in any protected activity, such as filing a claim of disability, *before* the restructure occurred. Rather, the evidence indicates that Davis's first request for an accommodation came more than one month after the alleged restructure. In order to advance a retaliation claim, Davis's counsel attempts to suggest that her conversion from an hourly worker to a salary worker was retaliation for Davis's late-May request for an accommodation to work at home. Counsel argues that the conversion to salary occurred right on the heels of her request and asserts that temporal proximity alone is "sufficient to prove retaliation." (Doc. 29, p. 21).

However, as the Court has explained *supra* at pp. 13-14, Davis has not demonstrated that this conversion was *adverse*. Unlike a termination or disciplinary action, the undisputed evidence in the record discussed above suggests that this conversion was nothing but beneficial for Davis—in two particular ways. First, the

evidence suggests that she earned comparatively more per pay period following her conversion to salary than she had for the two months preceding the conversion. (Doc. 25-1, ¶ 7). Second, her conversion to salary also, because of KMS's policies, meant that she accrued more vacation and leave time—leave which she in fact took before going out on more permanent FMLA leave. (Doc. 24, p. 12). For the reasons noted above, this Court finds that this conversion to salary is not an adverse employment action capable of completing Davis's *prima facie* case. Because Davis has not proven an essential element of her *prima facie* case, summary judgment is proper on this claim.

### 3. Age Discrimination Claim (ADEA)

In order to establish a *prima facie* case of age discrimination, Davis must either provide direct evidence indicating intentional discrimination or, under the *McDonnell Douglas* framework, establish a *prima facie* case of age discrimination by showing that (1) she is over forty; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) similarly-situated employees outside the class were treated more favorably.[14]  *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 523 (8th Cir. 2010)

---

[14] The Court proceeds directly to determining whether Davis has made out a *prima facie* case because it has been presented with no direct evidence of age discrimination. Davis's counsel argues that her supervisor's reference to Davis as "Momma Bear" and the use of "mother hen" in her evaluation constitute direct evidence. This Court disagrees. It is well established in this circuit that direct evidence does not include "stray remarks" in the workplace. *Morgan v. A.G. Edwards*, 486 F.3d 1034, 1043 (8th Cir. 2007) (citing *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir. 1993)). Although these are great examples of poor choices of phrase, they are far from rising to the level of prototypical direct evidence of age discrimination. *See, e.g.*, *Denesha v. Farmers Ins. Exch.*, 161 F.3d 491, 504 (8th Cir. 1998) (finding numerous statements by supervisors that older employees work was inferior to younger employees to be direct evidence of age discrimination); *Williams v. Valentec Kisco, Inc.*, 964 F.2d 723, 728 (8th Cir. 1992) (statement about an "old man carrying the boxes" could be considered direct evidence of age discrimination). In short, the causal strength of these two statements is not enough to elevate them to direct evidence.

(citing *Thomas v. Corwin*, 483 F.3d 516, 528 (8th Cir. 2007)). If she establishes a *prima facie* case and the Defendants put forward a legitimate, non-discriminatory reason for the employment action, the burden shifts back to Davis to demonstrate pretext. As the Eighth Circuit has noted, this ultimately means that "the plaintiff has the burden of persuasion at all times . . . [and therefore, the Plaintiff's] burden to show a genuine issue of material fact regarding pretext 'merges with the ultimate burden of persuading the court that [she was] the victim of intentional discrimination.'" *Bone v. G4S Youth Servs.*, 686 F.3d 948, 955 (8th Cir. 2012) (citing *Torgerson v. City of Rochester*, 643 F.3d 1031, 1046 (8th Cir. 2011)). And, subsequent to the United States Supreme Court's opinion in *Gross*, she must also show that her age was the "but-for" cause of the challenged adverse employment action. *Gross v. FBL Fin. Serv., Inc.*, 557 U.S. 167, 177 (2009).

For the purposes of this claim, Defendants admit that Davis is able to establish the first two elements of her *prima facie* case. In addition, this Court has previously held that she has presented enough evidence at the *prima facie* stage to show that she suffered an adverse employment action through the restructure that caused her alleged demotion and reduction in job responsibilities. Therefore, the only remaining element of the *prima facie* case Davis is required to prove is that similarly situated employees outside of the class were treated more favorably. Defendants argue that she is unable to establish this for two independent reasons. First, they argue that she is not similarly situated to those individuals she seeks to use as comparators; and second, they argue that, even if these individuals are similarly situated to Davis, they were not treated more favorably.

Although the Court finds her evidence on this point to be weak, it agrees with Davis that she has met her minimum burden at the *prima facie* stage. *See Rodgers v. U.S.*

*Bank, N.A.,* 417 F.3d 845, 851-52 (8th Cir. 2005) ("low-threshold" is the standard to be used at the *prima facie* stage), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011). Davis has pointed to evidence in the record to show that she was treated dissimilarly from Sean DeWitt. This evidence includes her argument that, after training DeWitt and after presiding over the creation and growth of the Warranty Department, she was demoted only to have DeWitt effectively become the new Manager over the Department. In fact, DeWitt himself stated during his deposition that he began managing the Warranty Department when Davis left. (Doc. 26-1, p. 11). Therefore, Davis has pointed to enough evidence in the record to suggest that she was treated differently from the much younger DeWitt to establish a *prima facie* case.

As proof of legitimate, non-discriminatory reasons for its actions, KMS points to the growth of the company which necessitated the restructurings, the fact that Davis had 'begged' for assistance, the fact that DeWitt had been moved into the Warranty Department for the express purpose of overseeing the restructuring, and evidence that DeWitt was given an inferior region compared to the more favorable home base that Davis was assigned when the restructuring occurred. (Doc. 25-2, pp. 130-31). This is more than enough to meet their burden of production on this issue.

Thus, Davis must show that KMS's asserted restructuring was merely pretextual. It is important to note here that, unlike at the *prima facie* stage, the test for determining whether a comparator is similarly situated at the pretext stage is much more rigorous. *Johnson v. Securitas Sec. Serv. USA, Inc.*, 769 F.3d 605, 613 (8th Cir. 2014) (noting that plaintiff must show that comparator is "similarly situated in all respects"). Thus, at this stage, Defendants argue that DeWitt cannot be used as a comparator for showing that

KMS's reasons for treating Davis and DeWitt differently were pretextual. This Court agrees.

Unlike Davis, DeWitt was classified during the relevant time at KMS as a Project Manager I employee, earning a salary of $75,000 (only $3,500 more than Davis). (Doc. 36). In addition, while Davis only had a high school diploma, DeWitt had two Master's degrees, an undergraduate degree in Business Administration, and a past employment history of working as a consultant to businesses implementing new procedures. (Doc. 26-1, pp. 6-10; Doc. 36). He was also tasked with handling special projects at KMS, including overseeing the restructuring of the Warranty Department. That he would have assumed more responsibility when Davis, the Department's most senior employee, went out on leave is far from shocking. Moreover, the evidence also undercuts Davis's position that DeWitt ever assumed the role of Director of Warranty or assumed the position of her supervisor.[15] *See* Doc. 20-2, p. 29. Thus, at the pretext stage, DeWitt is not a sufficiently similar comparator by which to measure Davis's treatment.

Davis supports her pretext argument by offering an affidavit from her daughter, a former KMS employee, who states that the Warranty Department was never restructured. (Doc. 30-3, p. 1). Her daughter states that the geographical division of labor had in fact been implemented by Davis back in 2014 and that the "warranty department was not restructured in any shape, form, or fashion." *Id.* However, besides the fact that this affidavit does not refute KMS's evidence that three new employees, including DeWitt, were

---

[15] For instance, in her deposition, Davis was asked:

Q: "Would you agree with me that they did tell you if, you know, you had doctors' appointments or medical testing, for example, that would keep from you coming into the office on a particular day, just to let them know? They told you that, right?

A: "Yes, Dustin did, but Sean on a couple of occasions asked me if I could reschedule and I just told him no and went on about my business."

brought in to oversee these regions, this affidavit also directly conflicts with Davis's own deposition testimony that the restructure did in fact happen at KMS and that she was the one who asked for the Warranty Department to be next in line for restructuring. Defendants are correct that a plaintiff cannot "avoid summary judgment by proffering testimony from another person that contradicts the plaintiff's own testimony." *Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995); *see also Am. Airlines, Inc.* v. *KLM Royal Dutch Airlines, Inc.*, 114 F.3d 108, 111 (8th Cir. 1997).

Given all of this, Davis has failed to show that KMS's restructuring was a pretext for age discrimination. Moreover, the evidence Davis identifies is inadequate to demonstrate that her age was the but-for cause of KMS's actions. To the extent the evidentiary record supports any kind of discriminatory animus on KMS's part, it supports it only with regards to Davis's health, not her age. For this reason, summary judgment for Defendants is proper on her ADEA claim as well.

### 4. Gender Discrimination- Title VII

Just as with her age discrimination claim, to succeed on her gender discrimination claim, Davis must show "either direct evidence of discrimination or evidence . . . sufficient to create an inference of discrimination under the *McDonnell Douglas* burden shifting framework." *Robinson v. Am. Red. Cross,* 753 F.3d 749, 754 (8th Cir. 2014) (citation omitted).

Davis has offered no direct evidence of gender discrimination.[16] As a result, to make out a *prima facie* case of gender discrimination, she must show that she "(1) is a

---

[16] Again, references to Davis as "Momma Bear" and "Mother Hen", while perhaps inappropriate, are not direct evidence of intentional gender discrimination. Thus, the Court must use the *McDonnell Douglas* burden-shifting framework.

member of a protected class, (2) was qualified, (3) suffered an adverse employment action, and (4) can provide facts that give rise to an inference of unlawful . . . discrimination." *Id.* One classic way to provide facts that give rise to an inference of unlawful discrimination involves demonstrating that similarly-situated employees were treated in a disparate manner. *See, e.g.*, *Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014).

Defendants do not dispute that Davis meets the first two elements of the *prima facie* case, and the Court has already decided that at the *prima facie* stage, she has advanced enough evidence to demonstrate that she suffered an adverse employment action. Moreover, the Eighth Circuit has held that a plaintiff can make out a *prima facie* case of gender discrimination by proving that the employer hired a member of the opposite sex for the position. *See, e.g.*, *Kobrin v. Univ. of Minn*, 34 F.3d 698, 702 (8th Cir. 1994). For this reason and for the reasons explained above in the ADEA context, Davis can make out a *prima facie* case of gender discrimination with respect to her treatment as compared to Sean DeWitt.

Davis made clear, for the first time in her Reply Brief, that she also seeks to establish a claim of gender discrimination against KMS with respect to her treatment as compared to male individuals who held Director-level positions at KMS. Davis's argument on this point is that these Director-level (O5) employees should be used as comparators because Davis performed "in all respects" as an O5 but was never given that title or treated like a Director. (Doc. 29, p. 7).

However, the Court finds that it cannot use these individuals as comparators because the evidence in the record, put forward by Defendants and admitted to by Davis

herself in her deposition is that Davis was always an O4 and these individuals were always more senior, O5 employees. (Doc. 30-1, pp. 174, 178). Even at the *prima facie* stage, she has not persuasively demonstrated, through admissible evidence in the record, that she was similarly situated to these individuals. She has, for instance, put forward no evidence to suggest that their workplace duties and hers significantly overlapped, that they supervised similar numbers of individuals, etc. Davis's argument that there were discussions about promoting her to an O5 position does not help her—as that change, rightly or wrongly, never materialized. *See* Doc. 33-1, p. 11.

As such, the evidence that this Court has to rely on from the record suggests that Davis and these Director-level employees are not in the least bit similarly situated. For instance, the KMS organizational chart confirms that her pay (both before and after the conversion to salary) aligned with an O4 level position, not an O5 position (which has a salary that is negotiated). (Doc. 36, p. 1). In addition, the evidence suggests that O5 level employees reported directly to the President or CEO of the company. There is no dispute that Davis never reported directly to the President or CEO. Moreover, employment information from KMS filed under seal suggests that many of these O5 level employees supervised a greater number of individuals, had jobs that required them to work as liaisons to contractors and site administrators for projects (thus supervising both office and field employees), and worked on the revenue-generating side of KMS's operations. *See* Doc. 36, pp. 2-6. In addition, unlike Davis, many of these would-be comparators had decades of experience, advanced degrees, and technical certifications. In short, these disparities highlight the weakness of Davis's attempt to use these O5 employees as similarly situated comparators and the glaring absence of direct evidence in the record

that her responsibilities were similarly situated to theirs. Thus, while the burden at the *prima facie* stage is low, she has not demonstrated a *prima facie* case of gender discrimination with respect to her treatment compared to these O5 employees.

Thus, using DeWitt as the only similarly situated comparator to Davis, the Court finds, for the reasons explained above regarding her ADEA claim, that KMS has met its burden of putting forth evidence supporting a legitimate, non-discriminatory reason for the actions it took, and that Davis has not put forth enough evidence on which a reasonable jury could decide that KMS's articulated reasons were pretextual. Thus, summary judgment is proper on this claim as well.

### 5. FMLA Retaliation

"The FMLA prohibits employers from discriminating against an employee for asserting his rights under the Act." *Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002) (citing 29 U.S.C. § 2615(a)(2)). As the *Darby* court indicated, "this prohibition necessarily includes consideration of an employee's use of FMLA leave as a negative factor in an employment action." *Id.* Thus, when an employer bases an adverse employment on an employee's use or request for leave, the FMLA provides a cause of action. *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002).

Davis cannot make out a *prima facie* case of FMLA retaliation. Similar to her ADA retaliation claim discussed above, she alleges that KMS took adverse actions against her including docking her pay, reducing her job responsibilities, and demoting her to a Regional Manager when she had been overseeing the Warranty Department pre-restructuring. However, Davis has a temporal problem with establishing a *prima facie* case of FMLA retaliation. It is undisputed that she only requested FMLA leave beginning

in September of 2015 and that, before this point, she had never made a request or complaint to KMS for FMLA leave. Moreover, the record reflects that her pre-FMLA requests to use both accrued and un-accrued vacation time were granted by KMS. Finally, all of these allegedly adverse employment actions occurred at or around April of 2015 when the Warranty Department restructure was announced to all KMS employees.

She does not, for instance, allege that any adverse action took place *after* her request for leave in September. But, it would be these adverse employment actions following a request for FMLA leave that she would have to allege and prove to make out a retaliation claim. Allowing an event that took place at least five months *prior* to an FMLA request to constitute *retaliation* for that request is illogical. *See, e.g.*, *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir.2006) ("A pattern of adverse actions that occur just *after* protected activity can supply the extra quantum of evidence to satisfy the causation requirement.") (emphasis added). Therefore, Defendants are entitled to summary judgment on this claim as well.

### B. Non-*McDonnell Douglas* Claims

### 1. ADA Reasonable Accommodation

A plaintiff alleging a failure-to-accommodate violation of the ADA need not engage with the traditional *McDonnell Douglas* framework. "This is so because a claim against an employer for failing to reasonably accommodate a disabled employee does not turn on the employer's intent or actual motive. The *McDonnell Douglas* line of cases, however, is aimed at fleshing out this elusive factual question of intentional discrimination." *Peebles*

*v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004) (quotation omitted). Instead, the Eighth Circuit has prescribed "a modified burden-shifting analysis," *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003) (quotation omitted), in which the plaintiff "must establish both a prima facie case of discrimination based on disability and a failure to accommodate it," *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 905 (8th Cir. 2015). The plaintiff then has the burden to show "that the requested accommodation is 'reasonable on its face, *i.e.*, ordinarily or in the run of cases.'" *Peebles*, 354 F.3d at 768 (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)). The Eighth Circuit has also recognized that the ADA creates a "shared responsibility between employers and employees to resolve accommodation requests." *E.E.O.C. v. Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d 790, 795 (8th Cir. 2007). This shared responsibility is more frequently referred to as the "interactive process." *Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 902 (8th Cir. 2009).

Davis cannot establish a *prima facie* case that KMS failed to accommodate her. Davis's failure-to-accommodate argument rests solely on the fact that she was not granted her request to work from home five days a week for a six-month period. (Doc. 29, p. 13). However, "a disabled individual is not entitled to an accommodation of his choice." *Rehrs v. Iams Co.,* 486 F.3d 353, 359 (8th Cir. 2007). Rather, the plaintiff must put forth evidence that shows that "the employer did not make a good faith effort to assist the employee in seeking accommodation." *Cravens v. Blue Cross & Blue Shield of Kan. City*, 214 F.3d 1011, 1021 (8th Cir. 2000).

The evidence shows that KMS did in fact engage in the interactive process with Davis once she presented the doctor's note in May of 2015. In fact, KMS's good faith

efforts not only included reaching an agreement with Davis to work from home (which Davis consented to in writing), but also included KMS granting *every* single request for assistance that Davis asked for—including the ability to use two weeks of vacation time that had not yet accrued. Given the evidence in the record, Defendants are entitled to summary judgment on this claim as well because there is no genuine dispute about KMS's engagement in the good faith effort to accommodate Davis's disability. Davis's argument that this arrangement eventually was watered down when she was asked to come in to help the department when DeWitt had a standing Thursday engagement does not alter the Court's conclusion. She has not carried her burden of demonstrating that KMS failed to accommodate her.

### 2. FMLA Interference

In order to establish a claim for FMLA interference, Davis must show that her employer has interfered with, restrained, or denied the exercise or the attempt to exercise any right protected by the statute. *Rogers v. City of Des Moines*, 434 F.3d 904, 909 (8th Cir. 2006); 29 U.S.C. § 2615(a)(1). However, it is black letter law that the FMLA provides no relief to a plaintiff unless she has been prejudiced by the violation. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002); *see also Rogers*, 435 F.3d at 909. That is due, in part, to the fact that the cause of action for FMLA Interference is narrow. *See, e.g.*, *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 739-40 (2003) ("[T]he cause of action under the FMLA is a restricted one: The damages recoverable are strictly defined and measured by actual monetary losses.").

The facts of *Rogers* are particularly instructive here as the plaintiff in that case brought suit alleging, *inter alia*, that she should be entitled to relief because "the City

interfered with her right to take FMLA leave by discouraging her from taking leave, including delaying the approval of her leave, disciplining her for taking leave, and stripping her of her job duties for taking leave." *Rogers*, 435 F.3d at 909. However, in affirming the grant of summary judgment, the Eighth Circuit held that because the undisputed evidence demonstrated that she actually *received* her requested FMLA leave, she was unable to demonstrate that she suffered prejudice. *Id.*

Here, the undisputed evidence shows that Davis received her FMLA leave. In fact, after she requested FMLA leave in September of 2015, the company not only granted her request, but made the leave retroactive to July 7, 2015, which is when she first began taking extended periods off from work. Before that, the record evidence reflects that KMS even allowed her to use vacation time that had not yet accrued in order to remain at home. There is no evidence in the record that KMS discouraged or interfered with her ability to exercise leave. In fact, the only allegation that Davis offers in her deposition is that it was she who had to request the leave and not KMS that offered it (Doc. 25-2, p. 20). This is insufficient to preclude summary judgment. Rather, the evidence indicates that she was granted every request for accommodation that she asked for and that she obtained her FMLA benefits and, coincidentally, is still receiving benefits on KMS's dime. Thus, Davis has not demonstrated that she was in any way prejudiced because she had to reach out to KMS in order to begin the leave process paperwork. As a result, Defendants are entitled to summary judgment on this claim.

### 3. Equal Pay Act

Despite only mentioning the EPA at the tail-end of her Complaint, *see* Doc. 3, ¶ 51, both parties have briefed whether Davis has made out an EPA claim, and the Court

has been sufficiently briefed such that it may determine whether summary judgment is proper on this claim.

The EPA prohibits sex-based pay discrimination. *Price v. N. States Power Co.*, 664 F.3d 1186, 1191 (8th Cir. 2011). Claims under the EPA are governed by the same standards as Title VII gender-based wage discrimination claims. *See, e.g.*, *Taylor v. White*, 321 F.3d 710, 715 (8th Cir. 2003). Thus, a plaintiff must first establish a *prima facie* case of wage discrimination on the basis of gender.

To establish such a case, a plaintiff must "prove that the employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions." *E.E.O.C. v. Delight Wholesale Co.*, 973 F.2d 664, 669 (8th Cir. 1992) (citing *McKee v. Bi-State Dev. Agency*, 801 F.2d 1014, 1019 (8th Cir. 1986), in turn quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)). Although the Eighth Circuit does not require that the two jobs be identical, *Horner v. Mary Inst.*, 613 F.2d 706, 713 (8th Cir. 1980), the Court must look to the actual job requirements and performance to determine "whether the jobs require substantially equal skill, effort and responsibility under similar working conditions." 29 U.S.C. § 206(d)(1).

If a plaintiff is able to establish a *prima facie* case of wage discrimination, an employer may then prove that any wage differentials are explained by one of the statutorily prescribed affirmative defenses: a seniority system, a merit system, a system which measures earnings by quantity or quality of production, or a differential based on any other factor other than sex. *Price*, 664 F.3d at 1191. Because the legal framework for establishing an EPA claim is the same as for establishing a Title VII-based gender

discrimination claim, the Eighth Circuit has held that "if summary judgment [is] proper on the [plaintiff's] EPA claim, it was also proper on [plaintiff's] . . . Title VII claims." *Price*, 664 F.3d at 1191.

Because the EPA, at bottom, mandates "equal pay for equal work," *Price*, 664 F.3d at 1192, those elements are central to establishing a *prima facie* case. *Id.* at 1193. As a result, the Eighth Circuit has held that a plaintiff did not make out a *prima facie* case where a woman tool maker was "paid the same as, or more than, at least some male tool makers in the tool room." *Id.* (citing *Sowell v. Alumina Ceramics, Inc.*, 251 F.3d 678, 684 (8th Cir. 2001)). Relatedly, the *Price* opinion quotes favorably from a Fourth Circuit case where the court held that a professor had not made out a *prima facie* case under the EPA because she "had not furnished information about such factors as comparative teaching load, research, or level of service." *Id.* (citing *Houck v. Va. Polytechnic Inst. & State Univ.*, 10 F.3d 204, 206 (4th Cir. 1993)). Similarly, in *Orahood v. Board of Trustees of University of Arkansas*, the Eighth Circuit affirmed a grant of summary judgment where the district court held that two jobs were not substantially similar when, even though both were supervisory, one of the departments was larger than the other, one involved supervising more employees than the other, and one required different knowledge (different skillset, advanced degrees, etc.). 645 F.2d 651, 654-56 (8th Cir. 1981).

As discussed more fully above when considering her age and gender discrimination claims, Davis has put forward no evidence suggesting that similar employees were paid differently for similar work. As noted in those sections, Davis's attempts to use KMS employees who were classified at the O5 level as comparators is misplaced. She has not demonstrated that any of these individuals were similarly situated

to her or performed similar work. Her attempt to classify herself as an O5 Director-level employee is wholly unsupported by any evidence in the record beyond her own statement that at one point she was discussing the possibility of being promoted to that level. Despite this conversation, the facts show that she was never at the O5 level and these individuals cannot be used as comparators to establish an EPA claim.

For similar reasons, Davis produces no evidence to suggest that Sean DeWitt was paid substantially different amounts for substantially similar work. In fact, the evidence in the record suggests otherwise. For instance, DeWitt's pay during the relevant time was only $3,500 more than Davis's. In addition, DeWitt was not an O4 level employee. Rather, he was a Project Manager I tasked by KMS to float in and out of various departments to handle special projects. Indeed, he was brought to the Warranty Department to oversee the restructure that occurred. He also, unlike Davis, had an undergraduate degree in Business Administration. Thus, even if Davis could establish that she and DeWitt were similarly situated, which the Court finds that she cannot, this small pay differential is readily explained away by DeWitt's different job classification, different duties, and different qualifications. These are all factors that would satisfy KMS's affirmative defense that any differential in pay between these two was based on factors other than sex. For these reasons, Defendants are entitled to summary judgment on this claim as well.

### C. Arkansas Civil Rights Act

Finally, Davis asserts claims under the ACRA for gender and disability discrimination and for retaliation.[17] Fortunately for analytical clarity, claims premised on

---

[17] The ACRA does not include age among those classes protected by the statute. *Harmon v. Gerber Prod. Co.*, 2007 WL 3500433, at *1 (W.D. Ark. Nov. 14, 2007).

violations of the ACRA are analyzed in the same manner as their federal counterparts.[18] Therefore, because the Court found above that summary judgment was proper for Defendants on Davis's gender and retaliation claims, the Court will also grant them summary judgment on their ACRA-based gender and retaliation claims for the same reasons it granted summary judgment on the federal versions of these same claims. Not surprisingly, it will also deny summary judgment to the Defendants on their ACRA-based disability disparate treatment claim for similar reasons.

Therefore, Defendants' Amended and Substituted Motion for Summary Judgment (Doc. 23) is **GRANTED IN PART AND DENIED IN PART**. It is **GRANTED** with respect to the following claims asserted by Davis: ADA Retaliation, ADA Failure to Accommodate, ADEA Age Discrimination, Title VII Gender Discrimination, FMLA Interference, FMLA Retaliation, Equal Pay Act, and non-disability (disparate treatment) claims under the Arkansas Civil Rights Act. These claims against the Defendants are **DISMISSED WITH PREJUDICE**. Defendants' Motion for Summary Judgment is **DENIED** with respect to the ADA Disability (Disparate Treatment) claim and the related ACRA Disability (Disparate Treatment) claim.

There are three final matters before the Court at this time. The first relates to the claims that are cognizable against the individual Defendants. As noted earlier in this Opinion, Davis could bring individual capacity suits against these individual Defendants only for FMLA Retaliation, ACRA Retaliation, and Equal Pay Act discrimination. However,

---

[18] *See, e.g.*, Ark. Code Ann. § 16-123-103(c); *Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 615 n.3 (8th Cir. 2000) ("Claims premised under the Arkansas Civil Rights Act of 1993 are analyzed in the same manner as Title VII claims."); *Duty v. Norton-Alcoa Proppants*, 293 F.3d 481, 490 (8th Cir. 2002) ("At the outset, we note that we analyze a disability claim presented under the ACRA using the same principles employed in analyzing claims presented under the Americans with Disabilities Act… .").

as all of these claims have been dismissed with prejudice pursuant to Defendants' Motion for Summary Judgment, these individual Defendants should be, and hereby are, **DISMISSED** from the case.

Second, because of the unique procedural history of this case, the Court is aware that a Motion in Limine (Doc. 39) has already been filed by the Defendants that seeks to exclude anticipated testimony of certain witnesses for certain claims asserted by Davis. The Court has reviewed that Motion and the Response to it filed by Davis and understands that Defendants sought to exclude the testimony of these witnesses for Davis's gender, retaliation, and EPA claims. However, as these claims have all been dismissed with prejudice by this Order, Defendants' Motion in Limine (Doc. 39) is **MOOT**. Pursuant to the Court's Amended Case Management Order (Doc. 42), however, the parties are free to, within the time limits prescribed therein, submit additional motions in limine for the two claims that remain for trial.

Finally, as noted above, and in a manner consistent with these rulings, the Court will require the parties to provide further briefing on the proper scope (type and duration) of damages Davis may submit to the jury on her remaining ADA disparate treatment and related ACRA claims. The briefing schedule on this will be as follows: Davis's brief on this issue is due on or before **November 3, 2017.** KMS's response brief will be due on or before **November 10, 2017.**

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Amended and Substituted Motion for Summary Judgment (Doc. 23) is **GRANTED IN PART AND DENIED IN PART**. It is granted with respect to the following claims asserted by Davis: ADA Retaliation, ADA

Failure to Accommodate, ADEA Age Discrimination, Title VII Gender Discrimination, FMLA Interference, FMLA Retaliation, Equal Pay Act, and non-disability (disparate treatment) claims under the Arkansas Civil Rights Act. These claims against the Defendants are **DISMISSED WITH PREJUDICE**. The motion is denied with respect to the ADA disparate treatment and related ACRA claims, and those claims will proceed to trial.

**IT IS FURTHER ORDERED** that individual Defendants Rob Kimbel, Brad Smith, and Dustin Hughes, as a result of having the claims against them dismissed on summary judgment, are **DISMISSED FROM THIS ACTION WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Defendants' Motion in Limine (Doc. 39) is **MOOT** because the claims to which it pertains have been dismissed with prejudice by this Opinion and Order.

**IT IS FURTHER ORDERED** that Davis's brief on the proper scope of damages recoverable under the two remaining claims will be due on or before November 3, 2017. KMS's Response brief will be due on or before November 10, 2017.

**IT IS SO ORDERED** on this 25th day of October, 2017.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE